1  Robert L. Kelley  (SBN 114285)
2  **LAW OFFICES OF ROBERT L. KELLEY**
3  1000 Paseo Camarillo, Suite 231
   Camarillo, CA 93010
4  Telephone: (805) 388-8853
   Facsimile: (805) 987-3441
5  bob@robertkelleyinjurylawyer.com

6
7  Attorney for Plaintiffs ROSALIA AGUILERA;
   ESTATE OF MIGUEL AGUILERA TELLEZ;
8  and JULIAN AGUILERA

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11 ROSALIA AGUILERA, individually and        Case No.:  2:22-cv-01394-FWS-PD
   as the Successor-in-Interest to the
12 ESTATE OF MIGUEL AGUILERA               **DECLARATION OF ROBERT L.**
   TELLEZ; and JULIAN AGUILERA,            **KELLEY IN SUPPORT OF**
13                                          **PLAINTIFFS' OPPOSITIONS TO**
                 Plaintiffs,                **DEFENDANTS MOTIONS FOR**
14                                          **SUMMARY JUDGEMENT OR**
        vs.                                 **ALTERNATIVELY PARTIAL**
15                                          **SUMMARY JUDGEMENT**
   UNOCAL CORPORATION; CHEVRON
16 U.S.A. INC.; DOES 1 through 50; ROES     District Judge: Hon. Fred W. Slaughter
   A through Z; inclusive,                  Mag. Judge: Hon. Patricia Donahue
17
                 Defendants.
18                                          **Motion Date: May 25, 2023**
19                                          Action removed:   March 1, 2022
                                            Trial date:   Sept. 5, 2023
20
21                                          *Set concurrently with Motion for Leave to*
                                            *Amend Complaint on 05/25/23*
22

23            <u>**DECLARATION OF ROBERT L. KELLEY**</u>
24
   I, Robert L. Kelley, declare as follows:
25
26    1.  I am an attorney duly authorized to appear before this Court. I am an attorney
27 with the law firm of Law Offices of Robert L. Kelley. I am counsel for Plaintiffs
28                              – 1 –

Rosalia Aguilera, Estate of Miguel Aguilera Tellez and Julian Aguilera (together "Plaintiffs").

2. This Declaration is submitted in support of Plaintiffs' Oppositions to Defendants Motions for Summary Judgement.

3. I have personal knowledge of the matters contained in this declaration, and, if called upon to testify, would competently do so.

4. Attached hereto as "**EXHIBIT A**" is pertinent parts of the deposition of the deposition of David Poolman taken January 24, 2023. Dave Poolman confirms that DCOR had no building plans for the living quarters.

5. Attached hereto as "**EXHIBIT B**" is DCOR001483. This photograph documents that other than the perimeter frame, the cementitious board, which has been referred to by defendant as a subfloor, was supported by a single board, approximately 1 inch by 4 inches.

6. Attached hereto as "**EXHIBIT C**" is pertinent parts of the deposition of the deposition of Julian Aguilera taken April 7, 2023.

7. The living quarter's floor assembly contained an unreasonable risk to others by the installation of the moisture board.

8. The decedent, however, was immediately pushed out away from the platform, about 300 to 400 feet according to the deposition of Joe Van Dran, taken 04/10/23, not yet completed and produced for attaching.

– 2 –
**DECLARATION OF ROBERT L. KELLEY IN SUPPORT OF
PLAINTIFFS' OPPOSITIONS TO DEFENDANTS MOTIONS
FOR SUMMARY JUDGEMENT**

9.  The evidence is in conflict concerning whether the decedent, who could not swim, was conscious or not after he fell in the Pacific Ocean.

10. Witnesses have stated that he was trying to swim, and others have testified that he was on his back right after falling, not moving his limbs. It is not possible to know whether being able to swim or not would have made a difference in light of the 5-foot swells, the significant current, and whether he was conscious or not. Mr. Aguilera drowned on that day.

11. During discovery there was significant discussion about whether decedent and crew should have been wearing life jackets or anti-fall harnesses. All testimony was that the work inside the living quarters did not require harnesses or life jackets.

12. There is no evidence that the safe work permit or the 12/02/20 Job Safety Analysis, done by DCOR, had anything to do with the causation of the incident or that safety meetings or the lack thereof played any part regarding causation. The safe work permit had nothing to do with causation of the incident.

13. Attached hereto as "**EXHIBIT D**" is the structural plans which indicate that Union Oil is to supply the living quarter. Union Oil took responsibility for the living quarters and could have installed them or could have hired a contractor to install them.

14. Defendants never received building plans from Delta Builders for the living quarters that were installed on platform Gilda around 1981.

– 3 –
**DECLARATION OF ROBERT L. KELLEY IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS MOTIONS FOR SUMMARY JUDGEMENT**

15. On March 23, 2023 Plaintiff received discovery documents that it had been waiting four months for. This discovery was received after the initial round of expert designations.

16. Plaintiff received discovery for which it had been waiting four months to receive. This discovery was received the day before expert disclosures were due. Inside these discovery documents served by defendants was a document from 1989, addressed to Unocal by a contractor who was inspecting the living quarters on Platform Gilda, attached hereto as a true and correct copy as **"EXHIBIT E."** After receiving this document, numerous other documents were obtained, all with Unocal's name on them, demonstrating active participation and operational control regarding Platform Gilda.

17. After the living quarters inspection in 1989 defendants never obtained or produced building plans for the living quarters.

18. Plaintiffs' request for production of documents included a request for the living quarter's plans from defendants but no such documents were served. Additionally, DCOR did not serve any living quarter's plans on BSEE when requested during their investigation.

19. There is no evidence in the record showing that Defendants ever informed anyone about the deterioration problem in the living quarter's flooring. There is no

– 4 –

**DECLARATION OF ROBERT L. KELLEY IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS MOTIONS FOR SUMMARY JUDGEMENT**

record in the file that Defendants informed anyone, at any time, that Defendants did not have plans for the living quarters,

20. The 1983 reorganization documents between Unocal and Union Oil of California were not produced in discovery and Defendants have refused to provide them. At this point there are no documents in the records memorializing this event.

21. The 2006 APA between Unocal and Chevron was never produced by Defendants.

22. Because the APA between Unocal and Chevron Corp. was not served on plaintiffs it is not known what the responsibilities of the contract participants were pursuant to that agreement.

23. Plaintiffs named Unocal Corporation in their complaint instead of Union Oil of California ("Union Oil") and/or Unocal California Pipeline Company ("Unocal California"), who, we now know from defendant's recent discovery responses, is the subsidiary of Unocal Corporation and is the party(ies) plaintiffs, as alleged by defendant, plaintiff could have sued.

24. Plaintiffs were not aware of the true legal names of Defendants until April 7, 2023 and April 13, 2023 when Defendants served additional discovery responses.

25. The misnomer and/or misnaming of Defendants is set before the Court by way of a Motion to Amend (Doc 50; 51) and is presently set for the same day as this Motion for Summary Judgement.

**DECLARATION OF ROBERT L. KELLEY IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS MOTIONS FOR SUMMARY JUDGEMENT**

26. When Defendant, Unocal, had the living quarters inspected in 1989 they became aware that there were no building plans for this building by way of a letter sent to Unocal. Attached hereto as **"EXHIBIT E"** is a true and correct copy of the 1989 Unocal letter. This letter revealed that the wooden living quarters' walls and floors were already having water damage issues after only 8 years of service. **"EXHIBIT E"** clearly states that there was no technical data available at the time of the 1989 inspection, and Delta had been out of business for a few years. Unocal was the recipient *of that letter* and Union Oil was the entity that originally was responsible for producing and installing the living quarter's building, see Exhibit "D."

27. Defendant has offered *no* evidence that Unocal ever told any buyer that the living quarters building had issues with water damage.

28. There is no evidence that Defendant ever obtained building plans for its employees to use, or for the buyer's employees to use but, now argue that one of the causes of the incident is that the workmen did not review the plans they did not provide.

29. Attached hereto as **"EXHIBIT F"** is a true and correct copy of the photograph of Platform Gilda.

30. Attached hereto as **"EXHIBIT G"** is a true and correct copy of a document dated December 12, 1985 concerning geological data that the Mineral Management Service requested concerning Platform Gilda and Unocal Corporation, Platform Gilda

– 6 –

**DECLARATION OF ROBERT L. KELLEY IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS MOTIONS FOR SUMMARY JUDGEMENT**

Update to Plan of Development, (October 1985),

https://www.boem.gov/sites/default/files/documents/1985-POD-Update.pdf.

31. Attached hereto as **"EXHIBIT H"** is a true and correct copy of a confidential document dated October 3, 1985 which is titled Update to Plan of Development. This document demonstrates how deeply Unocal was involved in the development of Platform Gilda and the Santa Clara Unit, Platform Gilda Update to Plan of Development, (October 1985),

https://www.boem.gov/sites/default/files/documents/1985-POD-Update.pdf.

32. Attached hereto as **"EXHIBIT I"** is a true and correct copy of a letter dated July 29, 1986 regarding Platform Gilda from the Department of the Interior to Unocal Corporation and Unocal Oil and Gas Division.  This letter also demonstrates heavy involvement regarding Platform Gilda by Unocal Corporation. This letter concerns platform Gina another Union Oil Platform that was installed in the early 1980's by Union Oil.  This letter concerns the production plan among other items related to this platform and further demonstrates the involvement of Unocal, Plan of Development Documents, (July 29, 1986),

https://www.boem.gov/sites/default/files/documents/1985-POD-Update-Approval.pdf.

33. Attached hereto as **"EXHIBIT J"** is a true and correct copy of letter dated March 25, 1986 from James W. Wright from the United States Department of the Interior regarding Platform Gilda and Unocal concerning a development plan, Plan of

**DECLARATION OF ROBERT L. KELLEY IN SUPPORT OF
PLAINTIFFS' OPPOSITIONS TO DEFENDANTS MOTIONS
FOR SUMMARY JUDGEMENT**

Development Documents, (July 29, 1986),

https://www.boem.gov/sites/default/files/documents/1985-POD-Update-Approval.pdf.

34. The documents discussed above, **"EXHIBITS G-J"**, prove that Unocal was not a mere parent company of Union Oil but was in fact heavily involved in the serious business going on with this platform among others.

35. In 1989 a letter was produced and discussed above in which a contractor was hired to inspect Platform Gilda's living quarters, the same living quarters where this incident took place. That letter was addressed to Unocal not anyone else. The Living Quarters building plans were missing or never produced and the inspector informed Unocal that no technical data on the building existed. At that moment Unocal knew or should have known without those plans that the living quarters could not be properly inspected.

36. No discovery documents have been produced indicating that such information was passed along to Nuevo or any of the other buyers. No living quarter building plans have been produced by the Defendants at all meaning they likely never had any.

37. Without the 1983 reorganization documents Defendant cannot prove what part Unocal played in the Operation of Platform Gilda.

38. It is clear from documents, "**EXHIBITS E, G-J**," that Unocal was exercising at least some operational control over Platform Gilda.

39. BSEE is a United States Government agency that regulates the offshore oil and gas industry.

40. Witnesses have testified that tape was used and not used by the repair crew on 12/02/20.

41. Defendants also argue that Chevron, U.S.A., Inc. never owned, possessed, operated or controlled Platform Gilda. Furthermore, Defendant argues, plaintiffs had named Chevron, U.S.A., Inc. in their complaint instead of Chevron Corporation ("Chevron Corp."), who, we now know, is the subsidiary of Chevron, U.S.A., Inc. and is the party, as alleged by defendant, could have sued.

42. The misnomer and/or misnaming of Defendants is set before the Court by way of a Motion to Amend (Doc 50; 51) and is presently set for the same day as this Motion for Summary Judgement.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: April 27, 2023          Respectfully Submitted

**LAW OFFICES OF ROBERT L. KELLEY**

_/s/ Robert L. Kelley_

By:    Robert L. Kelley, Atty., SBN 114285
1000 Paseo Camarillo, Suite 231
Camarillo, CA 93010
Telephone: (805)388-8553
Facsimile: (805) 987-3441
bob@robertkelleyinjurylawyer.com
Attorney for Plaintiffs

– 9 –
**DECLARATION OF ROBERT L. KELLEY IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS MOTIONS FOR SUMMARY JUDGEMENT**

**EXHIBIT "A"**

**In the Matter Of:**

AGUILERA vs UNOCAL CORPORATION

2:22-cv-01394

---

**DAVID M.  POOLMAN**

*January 24, 2023*

---



800.211.DEPO (3376)
EsquireSolutions.com

**EXHIBIT A - PAGE 1**

DAVID M.  POOLMAN                                January 24, 2023
AGUILERA vs UNOCAL CORPORATION                                 1

```
 1              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
 2

 3   ROSALIA AGUILERA, individually
     and as the Successor-in-Interest
 4   to the ESTATE OF MIGUEL AGUILERA
     TELLEZ and JULIAN AGUILERA,
 5
                  Plaintiffs,
 6
       vs.                          CASE NO. 2:22-cv-01394
 7                                         FWS PD
     UNOCAL CORPORATION; CHEVRON,
 8   U.S.A., INC.; DOES 1 through 50;
     ROES A through Z; inclusive,
 9
                  Defendants.
10

11

12

13          VIDEOCONFERENCE DEPOSITION OF
                  DAVID M. POOLMAN
14

15

16               January 24, 2023
                   10:15 a.m.
17

18

19               Remote Proceeding
                 Oxnard, California
20

21

                 Dajana Donoslovic
22   Certified Electronic Reporter, Notary Public
               Commission No. 2388028
23

24

25
```



**EXHIBIT A - PAGE 2**

DAVID M. POOLMAN                                    January 24, 2023
AGUILERA vs UNOCAL CORPORATION                                  165

```
 1              CERTIFICATE OF TRANSCRIPTIONIST

 2

 3         I, Lauren H. Barnhill, Certified Verbatim

 4    Reporter, do hereby certify:

 5         That the foregoing is a complete and true

 6    transcription of the original digital audio recording

 7    of the testimony and proceedings captured in the

 8    above-entitled matter.  As the transcriptionist, I

 9    have reviewed and transcribed the entirety of the

10    original digital audio recording of the proceeding to

11    ensure a verbatim record to the best of my ability.

12         I further certify that I am neither attorney

13    for nor a relative or employee of any of the parties

14    to the action; further, that I am not a relative or

15    employee of any attorney employed by the parties

16    hereto, nor financially or otherwise interested in the

17    outcome of this matter.

18         IN WITNESS THEREOF, I have hereunto set my

19    hand this 6th day of February 2023.

20

21

22
```



```
23         Lauren H. Barnhill, CVR

24

25
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

**EXHIBIT A - PAGE 3**

DAVID M. POOLMAN                                    January 24, 2023
AGUILERA vs UNOCAL CORPORATION                                    31

DAVID M. POOLMAN                                    January 24, 2023
AGUILERA vs UNOCAL CORPORATION

1    thing -- I'm just bringing it up -- back up in a

2    second.  Sorry.

3    BY MR. KELLEY:

4        Q.  Does Juan Carlos still work for DCOR?

5        A.  I don't know.

6        Q.  Okay.  When was the last time you saw him?

7    Was that sometime around the incident?

8        A.  A few weeks after.

9        Q.  Did you talk to him?

10       A.  Yes.

11       Q.  What did he tell you, if anything, about the

12   incident?

13       A.  He told me what happened from his point of

14   view.

15       Q.  Was his point of view different from you --

16   what you had learned from others?

17       A.  No.

18       Q.  Have you ever seen as-built plans for

19   Platform Gilda?

20       A.  (No verbal response.)

21       Q.  Let me -- let me rephrase that question.  Do

22   you know if DCOR has possession of as-built Platform

23   Gilda plans?

24       A.  Yes.

25       Q.  Have you seen them?



**EXHIBIT A - PAGE 4**

DAVID M. POOLMAN                                    January 24, 2023
AGUILERA vs UNOCAL CORPORATION                                  32

DAVID M. POOLMAN                                    January 24, 2023
AGUILERA vs UNOCAL CORPORATION

1    A. Yeah. Can we take a quick break so I can get

2    this straight?

3              MR. KELLEY:  All right.

4              THE WITNESS:  All right.

5              MR. KELLEY:  Like five minutes?  That enough?

6    Or ten?

7              THE WITNESS:  Five minutes is fine.

8              MR. LARGE:  Five.

9              MR. KELLEY:  All right.

10             THE VIDEOGRAPHER:  Time is 11:01 a.m.  We're

11   off the record.

12             (A recess was taken.)

13             THE VIDEOGRAPHER:  The time is 11:06 a.m.

14   We're back on the record.

15   BY MR. KELLEY:

16        Q.  Okay.  I believe the last question was: Had

17   you seen the as-built plans for Platform Gilda?

18        A.  Yes.  There are a lot of as-built plans.  I've

19   seen a lot of as-built plans for Gilda, but don't

20   recall ever seeing any for the living quarters.

21        Q.  And would it be fair to say that you don't

22   know if the living quarters were built at the same time

23   as the platform?

24             MR. FLORES:  Objection.  Leading.

25             THE WITNESS:  I don't know.



**EXHIBIT A - PAGE 5**

DAVID M. POOLMAN                           January 24, 2023
AGUILERA vs UNOCAL CORPORATION                          35

DAVID M. POOLMAN                           January 24, 2023
AGUILERA vs UNOCAL CORPORATION

1    sometimes they would review the crew called a JA?

2        A.  A JSA?

3        Q.  Or JSA.  I'm sorry.

4        A.  No.

5        Q.  When is that produced, and who produces it?

6        A.  The guys doing the job generate that before

7    every job that they do.

8        Q.  And they're -- I assume, are trained to do

9    that?

10       A.  That's correct.

11       Q.  How did it come to pass that you became aware

12   that this floor work needed to be done?

13       A.  The lead operators on the platform told me.  I

14   had seen it.  I'd walked on it.  Noticed that it was

15   spongy, knew there needed to be a repair done.  When

16   the crews were available, we set it up.

17       Q.  You said it was spongy.  That -- would that

18   mean that when you -- when a person walks on it, it

19   would give -- start to give way to some degree?

20       A.  Not give way, just -- you could tell there was

21   moisture under the linoleum.

22       Q.  And did you determine where that moisture came

23   from?

24       A.  Yes.

25       Q.  And where did it come from?



**EXHIBIT A - PAGE 6**

DAVID M. POOLMAN                          January 24, 2023
AGUILERA vs UNOCAL CORPORATION

1      were there controlling cooler.

2      Q.  And did you witness the cooler actually

3      leaking water onto the floor?

4      A.  No.

5      Q.  Was that an assumption you made that -- that

6      the machine or the cooler was causing the problem

7      because the cooler was on top of that part of the

8      floor?

9      A.  Yes.

10     Q.  Can you describe or give me an estimate about

11     how big the cooler was?

12     A.  Four feet wide by two feet deep, roughly.

13     Q.  And did you identify a place on the cooler

14     that you thought a leak was coming from?

15     A.  Yes.

16     Q.  Please describe where you thought that leak

17     was coming from.

18     A.  There's a lip on the bottom that had water in

19     it.

20     Q.  And so would it have leaked at one end of that

21     lip, or would it have spilled over the lip and lip --

22     and spilled water over a -- a large area?  Or exactly

23     what did you conclude at the time?

24     A.  One end.

25     Q.  I believe you told me before, you've never



**EXHIBIT A - PAGE 7**

DAVID M. POOLMAN                                          January 24, 2023
AGUILERA vs UNOCAL CORPORATION                                       128

1    when I saw you today.  And she wishes to thank you for

2    everything that you did.

3              He's your witness, gentlemen.

4              THE REPORTER:  Mr. Flores, you're muted.

5                        EXAMINATION

6    BY MR. FLORES:

7         Q.  Mr. Poolman, my name is Rey Flores, and I

8    represent the defendants in this case.  Any -- any

9    questions about that?

10        A.  No, sir.

11        Q.  Okay.  So I've got a few questions for you as

12   well.  Now, Mr. Aguilera, what was his job title at the

13   time of this incident?

14        A.  He was a utility guy on the construction crew.

15        Q.  Okay.  Was he a painter?

16        A.  He was utility, which means he did everything.

17   Painting, rigging, scaffolding, spider work,

18   everything.

19        Q.  Okay.  So his job duties included various sort

20   of construction activities, I suppose, right?

21        A.  Correct.

22        Q.  But was his job title -- what was his job

23   title, if you know?

24        A.  His job title was utility/construction crew.

25   So we call --



**EXHIBIT "B"**



EXHIBIT B - PAGE 001
DCGR001483

**EXHIBIT "C"**

```
 1                UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                       ---o0o---
 4
 5
       ROSALIA AGUILERA,           )
 6     individually and as the     )
       Successor-in-Interest to    )
 7     the ESTATE OF MIGUEL        )
       AGUILERA TELLEZ; and        )
 8     JULIAN AGUILERA,            ) Case No.:
                                   ) 2:22-cv-01394-FWS-PD
 9                  Plaintiffs,    )
                                   )
10     v.                         )
                                   )
11     UNOCAL CORPORATION;         )
       CHEVRON U.S.A. IN.; DOES    )
12     1 through 50; ROES A        )
       through Z; inclusive,       )
13                                 )
                    Defendants.    )
14     _____    )
15
16
            VIDEOTAPED VIDEOCONFERENCE DEPOSITION
17
                    OF JULIAN AGUILERA
18
19
20            Friday, April 7, 2023
21                  10:00 a.m.
22
23
24
25         Reported by:  Amelia Macy, CSR, RPR
```

                                                  Page 1

EXHIBIT C - PAGE 1

| | | |
|---|---|---|
| 1 | Q.    Okay. | 10:42:13AM |
| 2 | All right.  So you all cut out the | 10:42:18AM |
| 3 | plywood, which is the first level under the | 10:42:21AM |
| 4 | linoleum; right? | 10:42:25AM |
| 5 | A.    Correct. | 10:42:26AM |
| 6 | Q.    And what did you observe once you got to | 10:42:27AM |
| 7 | good wood? | 10:42:29AM |
| 8 | A.    Once we got to good wood it was just what | 10:42:30AM |
| 9 | we assumed was metal plate. | 10:42:34AM |
| 10 | Q.    Well, so did you cut out the two by threes | 10:42:36AM |
| 11 | or two by fours? | 10:42:42AM |
| 12 | A.    We didn't have to cut them out.  They were | 10:42:44AM |
| 13 | completely gone.  I mean, you could grab them and | 10:42:46AM |
| 14 | crush them in your hands.  They were literal dust. | 10:42:49AM |
| 15 | Q.    There was -- they had to be cut back to | 10:42:53AM |
| 16 | some degree; right? | 10:42:56AM |
| 17 | A.    Yeah, very minimal.  Whatever -- I mean, | 10:42:57AM |
| 18 | it wasn't even much. | 10:42:59AM |
| 19 | Q.    Okay.  How long have you been working with | 10:43:00AM |
| 20 | DCOR? | 10:43:05AM |
| 21 | A.    Going on five years, six -- this will be | 10:43:06AM |
| 22 | my sixth year. | 10:43:09AM |
| 23 | Q.    Before you started working with DCOR did | 10:43:10AM |
| 24 | you do any sort of other maintenance work offshore | 10:43:12AM |
| 25 | for somebody else? | 10:43:15AM |

Page 34

**EXHIBIT C - PAGE 2**

| | | |
|---|---|---|
| 1 | Q.   Who is he? | 11:22:30AM |
| 2 | A.   He's just part of the safety.  That's all | 11:22:31AM |
| 3 | I know. | 11:22:34AM |
| 4 | Q.   Okay.  So you see the first slide here is | 11:22:34AM |
| 5 | an incident overview; right? | 11:22:41AM |
| 6 | A.   Right. | 11:22:44AM |
| 7 | Q.   And the second slide, it continues the | 11:22:44AM |
| 8 | incident overview.  You see that? | 11:22:47AM |
| 9 | A.   Yep. | 11:22:48AM |
| 10 | Q.   And it says here: | 11:22:49AM |
| 11 | "Early in the demo process, Miguel hit on | 11:22:51AM |
| 12 | the 5mm barrier with a tool and told Rudy | 11:22:55AM |
| 13 | incorrectly that it's metal and begins to step and | 11:23:00AM |
| 14 | work inside the demoed area with only the 5mm | 11:23:04AM |
| 15 | barrier of flooring underneath him." | 11:23:11AM |
| 16 | Do you see that? | 11:23:14AM |
| 17 | A.   Right. | 11:23:15AM |
| 18 | Q.   Do you dispute that or disagree with that | 11:23:15AM |
| 19 | in any way? | 11:23:19AM |
| 20 | A.   No. | 11:23:20AM |
| 21 | Q.   Now, you used that word earlier.  You said | 11:23:20AM |
| 22 | it was a "demo" that you were doing that morning; | 11:23:20AM |
| 23 | right? | 11:23:24AM |
| 24 | A.   Right. | 11:23:24AM |
| 25 | Q.   So it was destructive work; right? | 11:23:26AM |

Page 56

EXHIBIT C - PAGE 3

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, Amelia Macy, a Registered Professional

 4    Reporter licensed by the State of California, being

 5    empowered to administer oaths and affirmations

 6    pursuant to Section 2093(b)(1) of the Code of Civil

 7    Procedure, do hereby certify:

 8            That prior to being examined, the witness,

 9    Julian Aguilera, was present remotely via Zoom

10    videoconference, and was by me duly sworn to tell

11    the truth, the whole truth, and nothing but the

12    truth;

13            That said videotaped deposition was taken

14    down by me in stenotype, and was thereafter

15    transcribed and that a true and correct

16    transcription of said testimony is set forth in the

17    preceding pages;

18            I further certify that I am not kin or

19    otherwise associated with any of the parties to said

20    cause of action and that I am not interested in the

21    outcome thereof.

22            WITNESS MY HAND AND OFFICIAL SEAL this

23    21st day of April, 2023.

24

25

                   Amelia Macy, CSR, RPR

                                         Page 90
```

EXHIBIT C - PAGE 4

**EXHIBIT "D"**

# UNION OIL COMPANY OF CALIFORNIA

# PLATFORM "GILDA"



GUldA
DECOR

### O.C.S.  P-0216

### SANTA BARBARA CHANNEL

### WATER DEPTH = 205 FT.

### CALIFORNIA

## DRAWING INDEX

| DWG. NO. | TITLE | DWG. NO. | TITLE | DWG. NO. | TITLE | DWG. NO. | TITLE |
|---|---|---|---|---|---|---|---|
| | **GENERAL** | | **JACKET** | | **DECK** | | **TRANSPORTATION** |
| 9872-S-001 | GENERAL NOTES & DESIGN CRITERIA | 9872-S-120 | JACKET LAUNCH ASSEMBLY DETAILS - SHEET 1 | 9872-S-216 | STAIR LANDING DETAILS - SHEET 2 | 9872-S-301 | JACKET/PILE TIE-DOWN & BALLAST PLAN |
| | | 9872-S-121 | JACKET LAUNCH ASSEMBLY DETAILS - SHEET 2 | 9872-S-217 | STAIR DETAILS - SHEET 1 | 9872-S-302 | JACKET/PILE TIE-DOWN DETAILS |
| | | 9872-S-122 | MUDMAT & DETAILS | 9872-S-218 | STAIR DETAILS - SHEET 2 | 9872-S-303 | JACKET REINFORCEMENT FOR TRANSPORTATION |
| | | | | 9872-S-219 | TYPICAL DECK DETAILS | | |
| | **JACKET** | | | 9872-S-220 | DECK DRAINAGE SYSTEM PLAN | | |
| 9872-S-101 | JACKET FRAMING ELEVATIONS @ LINES 1, 2, 3 & 4 | | | 9872-S-221 | FIREWALL DETAILS - SHEET 1 | | |
| 9872-S-102 | JACKET FRAMING ELEVATIONS @ LINES A, B, & C | | | 9872-S-222 | FIREWALL DETAILS - SHEET 2 | | **INSTALLATION** |
| 9872-S-103 | JACKET FRAMING PLAN @ EL.(+)12'-0" | | | 9872-S-223 | DOOR DETAILS | 9872-S-401 | DECK INSTALLATION |
| 9872-S-104 | JACKET FRAMING PLAN @ EL.(+)28'-0" & EL.(-)78'-0" | | **DECK** | 9872-S-224 | SUB-DECK DETAILS | 9872-S-402 | JACKET LAUNCH & UPEND PROCEDURE |
| 9872-S-105 | JACKET FRAMING PLAN @ EL.(-)136'-0" & EL.(-)205'-0" | 9872-S-201 | DRILLING DECK FRAMING PLAN | 9872-S-225 | DECK PADEYE DETAILS | 9872-S-405 | PANCAKE DECK "A" INSTALLATION |
| 9872-S-106 | CONDUCTOR FRAMING PLAN & DETAILS | 9872-S-202 | PRODUCTION DECK FRAMING PLAN | 9872-S-226 | TRUSS & BRACING DETAILS | 9872-S-404 | MISCELLANEOUS SLING DETAILS |
| 9872-S-107 | CASING LOCATION & DETAILS | 9872-S-203 | SUB-DECK & WALKWAY FRAMING PLANS | 9872-S-227 | PANCAKE DECK "B" | | |
| 9872-S-108 | CASING SUPPORT & RISER CLAMP DETAILS | 9872-S-204 | PANCAKE DECK "A" | 9872-S-228 | HATCH COVER DETAILS | | |
| 9872-S-109 | NORTH BOAT LANDING | 9872-S-205 | DRILLING DECK PLATING & HANDRAIL PLAN | 9872-S-229 | FIREWALL DETAILS - SHEET 3 | | |
| 9872-S-110 | SOUTH BOAT LANDING | 9872-S-206 | PRODUCTION DECK PLATING & HANDRAIL PLAN | 9872-S-230 | PANCAKE DECK "C" | | |
| 9872-S-111 | BARGE BUMPER | 9872-S-207 | SUB-DECK/WALKWAY PLATING & HANDRAIL PLAN | | | | |
| 9872-S-112 | BOAT LANDING DETAILS | 9872-S-208 | DECK TRUSS ELEVATIONS | | | | |
| 9872-S-113 | BARGE BUMPER & BOAT LANDING DETAIL | 9872-S-209 | DECK BEAM & TRUSS DETAILS | | | | |
| 9872-S-114 | JACKET LIFTING PADEYE DETAILS | 9872-S-210 | DECK SECTIONS & DETAILS | | | | |
| 9872-S-115 | JACKET PILE DETAILS | 9872-S-211 | DECK MISCELLANEOUS DETAILS | | | | |
| 9872-S-116 | JACKET MISCELLANEOUS DETAILS | 9872-S-212 | TRUSS DETAILS - SHEET 1 | | | | |
| 9872-S-117 | JACKET FLOODING & GROUTING SYSTEM | 9872-S-213 | TRUSS DETAILS - SHEET 2 | | | | |
| 9872-S-118 | TYPICAL JACKET JOINT & WELDING DETAILS | 9872-S-214 | CRANE PEDESTAL DETAILS | | | | |
| 9872-S-119 | TYPICAL JACKET JOINT DETAILS | 9872-S-215 | STAIR LANDING DETAILS - SHEET 1 | | | | |

## SANTA FE ENGINEERING SERVICES COMPANY

### A DIVISION OF SANTA FE INTERNATIONAL CORPORATION

### ORANGE, CALIFORNIA





5. WELDING:
   AWS (AMERICAN WELDING SOCIETY) D1.1-79
   "STRUCTURAL WELDING CODE"

VII. PROTECTIV¼
     SEE S.P¼

# DESIGN CRITERIA: 2/3/07

※ LIMIT SOUTH END TO ZONE C, UNTIL SOUTH END HISTORY IS CHECKED OUT.

I. VERTICAL LIVE LOAD:
   I = UNIFORM LIVE LOAD.

PRODUCTION DECK

ₑ WELL

$P_1$ = PIPE RACK LOAD = 29.4 K/LF
$P_2$ = RIG LOAD = 535.7 K

2000 HP MAX, PIPE RACK & DRILL RIG & OPERATION

DRILL DECK

**LOAD IN LB PER SQ. FT.**

| DECK | AREA | DECK PLATE | DECK BEAM | TRUSS & COL. OPERATION |
|------|------|------------|-----------|------------------------|
| DRILL | A | 400 | 1000 | 750 |
| | B | 400 | 400 | RIG & PIPE RACK LOAD |
| | C | 200 | 200 | 300 |
| | D | 400 | 400 | 500 |
| PRO-DUCT'N | E | 400 | 200 | 100 |
| | F | 200 | 200 | 375 |
| | G | 400 | 600 | |
| SUB DECK | | 400 | 500 | |

2. STAIRS & LANDINGS & BOAT LANDING — 100 PSF

3. CRANE LOAD — REACTION DUE TO SEA KING "SK-2300"
                BOOM LENGTH = 100 FT.

II. LATERAL LOADS:
   1. WIND        — 75 KNOTS
   2. WAVE        — WAVE HEIGHT = 35 FT, PERIOD = 12 SEC.
   3. CURRENT     — 2.5 KNOTS AT THE SURFACE
                    0.8 KNOT AT THE BOTTOM
   4. SEISMIC     — BASED ON RESPONSE SPECTRA RECOMMENDED
                    BY FUGRO CONSULTING ENGINEERS & GEOLOGISTS.

EL. 0'-0"

ABBR

ABT.
BETW.
BOTT.

CLR.
COL.
CONT.
CONN.
C.G.
DET.
DWG.

EA.
EL.
EQ.

FLG.
F.F.
F.S.
F.B.

GALV.

HOR.
H.W.J.

I.D.

JT.

LB.

MAX.
MIN.

N.T.S.
N.
N.S.

## SANTA FE ENGINEERING SERVICES CO

A Subsidiary of Santa Fe International Corporation
Orange, California

| | Revisions & Issues | | By | D.H. | P.E. | App. | Date |
|--|--------------------|--|----|----|----|----|----|
| ⚠2 | ISSUED FOR CLIENTS APPROVAL | 1/18/01 | DY | DY | P. | | |
| ⚠1 | MAIN STEEL ISSUE | 1/8/01 | DY | MA | P. | | |
| No. | | Date | By | D.H. | P.E. | App. | |



## GENERAL NOTES:

**I. GENERAL:**

1. UNLESS SHOWN OR NOTED OTHERWISE ON THE DRAWINGS, ALL CONSTRUCTION SHALL COMPLY WITH THESE GENERAL NOTES AND SPECIFICATIONS ON THIS PROJECT.

2. DRAWINGS INDICATE GENERAL AND TYPICAL DETAILS OF CONSTRUCTION. WHERE CONDITIONS ARE SIMILAR TO DETAILS SHOWN ELSEWHERE ON THE DRAWINGS, ALTHOUGH NOT SPECIFICALLY SHOWN, THE DETAILS FOR SIMILAR CONDITIONS SHALL BE USED, SUBJECT TO APPROVAL OF THE DESIGN ENGINEER.

3. FABRICATOR SHALL VERIFY THE LOCATION OF EQUIPMENT SUPPORT BEAMS, PIPING PENETRATION THRU DECK PLATE AND EQUIPMENT BOLTING PLAN BEFORE FABRICATION.

4. ALL UNITS ARE IN FEET AND INCHES UNLESS NOTED OTHERWISE.

5. NORTH ARROW SHOWN ON THE DRAWINGS ARE PLATFORM NORTH.

**II. CODES AND STANDARDS:**

- THE DESIGN AND CONSTRUCTION SHALL COMPLY WITH THE FOLLOWING CODES AND STANDARDS. MATERIALS MEETING EQUIVALENT SPECIFICATIONS OF OTHER NATIONS MAY BE USED UPON THE STRENGTH OF THE DESIGN ENGINEER.

1. GENERAL SPECIFICATIONS:
   API (AMERICAN PETROLEUM INSTITUTE) RP 2A, 10TH EDITION MAR. 1979 "PLANNING, DESIGN AND CONSTRUCTION FIXED OFFSHORE PLATFORMS"

2. STRUCTURAL STEEL:
   AISC (AMERICAN INSTITUTE OF STEEL CONSTRUCTION) NOVEMBER 1978 "SPECIFICATIONS FOR THE DESIGN, FABRICATION AND ERECTION OF STRUCTURAL STEEL FOR BUILDING".

3. WELDING:
   AWS (AMERICAN WELDING SOCIETY) D1.1-79 STRUCTURAL WELDING CODE"

**III. STRUCTURAL STEEL:**

1. UNLESS SHOWN OTHERWISE ALL STRUCTURAL STEEL SHAPES AND PLATES SHALL BE ASTM A-36 AND ALL TUBULAR MEMBERS SHALL BE API 5L GRADE B SEAMLESS OR SUBMERGED ARC WELDED (S.A.W.)

2. ALL DECK PLATE SHALL BE SMOOTH PLATE.

3. ALL GRATING SHALL BE 1¼" x 3/16" BEARING BARS SHALL BE 1 3/16" ON CENTER. CROSS BAR SHALL BE 4" ON CENTER.

4. ALL PIPE BRACES SHALL BE CONTOUR CUT FROM TEMPLATES OR MACHINE TO FIT MEMBERS TO WHICH THEY CONNECT. ENDS TO BE BEVELED FOR WELDING TO DEVELOP FULL STRENGTH OF MEMBER.

5. ALL PIPE SIZE SHOWN ARE FOR OUTSIDE DIAMETER.

6. ALL ANGLES AND CHANNELS ARE JIS (JAPANESE INDUSTRIAL STANDARDS) ROLLED SECTIONS.

7. "HHW" AS SPECIFIED IN THE DRAWING SHALL BE NORMALIZED STEEL CONFORMING TO API SPECIFICATIONS 2H, MIN. YIELD STRESS SHALL BE 50 KSI AFTER NORMALIZATION.

**IV. WELDING:**

1. "P" OR "PA" INDICATES CONTINUOUS FULL PENETRATION GROOVE WELDS. FABRICATOR SHALL SUBMIT DETAILS OF GROOVE WELD FOR APPROVAL OF THE DESIGN ENGINEER BEFORE FABRICATION.

2. THE MINIMUM STRENGTH OF FILLER MATERIAL (ELECTRODES) SHALL BE 70,000 PSI.

3. ALL CONNECTIONS SHALL HAVE ¼" SEAL WELD AT THE PORTION WHERE STRUCTURAL WELD IS NOT INDICATED ON THE DRAWINGS.

**V. TIMBER:**

- TIMBER SHALL BE UNTREATED DOUGLAS FIR.

**VI. FABRICATION TOLERANCE:**

- FABRICATION TOLERANCE SHALL CONFORM TO API RP 2A, SECTION 5.

**VII. PROTECTIVE COATING:**

- SEE SPECIFICATION.

## DESIGN CRITERIA:

**I. VERTICAL LIVE LOAD:**

1 = UNIFORM LIVE LOAD.

### DRILL DECK

| DECK | AREA | DECK PLATE | DECK BEAM | TRUSS & COL. TRANSITION |
|------|------|-----------|-----------|------------------------|
| DRILL | 400 | 1000 | 750 |
| | 400 | 400 | 400 |
| | 200 | 100 | RIG & PIPE RACK LOADS |
| | 400 | 300 | 300 |
| | 400 | 1000 | 300 |
| PROD. | 400 | 400 | 200 |
| | 200 | 200 | 100 |
| SUB DECK | 400 | 500 | 200 |

*LOAD IN LB PER SQ. FT.*

### PRODUCTION DECK

*2000 HP MAX. PIPE RACK & DRILL RIG 6 OPERATION*

$P_1$ = PIPE RACK LOAD = 39.4 K/LF

$P_2$ = RIG LOAD = 338.7 K

2. STAIRS & LANDINGS & BOAT LANDING - 100 PSF

3. CRANE LOAD - REACTION DUE TO SEA KING 5-3300 BOOM LENGTH = 100 FT.

**II. LATERAL LOADS:**

1. WIND - 75 KNOTS

2. WAVE - WAVE HEIGHT = 35 FT., PERIOD = 12 SEC.

3. CURRENT - 2.5 KNOTS AT THE SURFACE 0.5 KNOT AT THE BOTTOM

4. SEISMIC - BASED ON RESPONSE SPECTRA RECOMMENDED BY FUGRO CONSULTING ENGINEERS & GEOLOGISTS.

## ABBREVIATIONS:

| | | | |
|---|---|---|---|
| ABT. | ABOUT | O.C. | ON CENTER |
| BETW. | BETWEEN | O.D. | OUTSIDE DIAMETER |
| BOTT. | BOTTOM | OPP. | OPPOSITE |
| CLR. | CLEAR | R. | RADIUS |
| COL. | COLUMN | REQ'D. | REQUIRED |
| CONT. | CONTINUOUS | | |
| CONN. | CONNECTION | S. | SOUTH |
| C.G. | CENTER OF GRAVITY | SECT. | SECTION |
| DET. | DETAIL | SIM. | SIMILAR |
| DWG. | DRAWING | STD. | STANDARD |
| | | STIFF. | STIFFENER |
| EA. | EACH | STR'L. | STRUCTURAL |
| EL. | ELEVATION | SYMM. | SYMMETRICAL |
| EQ. | EQUAL | | |
| | | T.O. | TOP OF |
| | | TYP. | TYPICAL |
| FLG. | FLANGE | T.O.S. | TOP OF STEEL |
| F.P. | FULL PENETRATION | BM. | BEAM |
| F.S. | FAR SIDE | U.N. | UNLESS |
| F.B. | FLAT BAR | | NOTED |
| | | U.T. | ULTRASONIC |
| GRTG. | GRATING | | TEST. SEE |
| GALV. | GALVANIZE | | SPECIFICATION |
| HOR. | HORIZONTAL | VERT. | VERTICAL |
| H.H.J. | HEAVY HALL JOINT | W.P. | WORK POINT |
| I.D. | INSIDE DIAMETER | | |
| JT. | JOINT | | |
| LB. | POUND | | |
| MAX. | MAXIMUM | | |
| MIN. | MINIMUM | | |
| N.T.S. | NOT TO SCALE | | |
| N. | NORTH | | |
| N.S. | NEAR SIDE | | |

### UNION OIL CO. OF CALIFORNIA

PLATFORM "GILDA"    QCS P-0216
SANTA BARBARA CHANNEL, CALIFORNIA

SANTA FE ENGINEERING SERVICES COMPANY

GENERAL ELEVATIONS
AND
DESIGN CRITERIA

Drawing No.
9872-S-001

---

### ELEVATION @ LINE (A) (LOOKING NORTH)
1" = 25'-0"

### ELEVATION @ LINE (1) (LOOKING WEST)
1" = 25'-0"

HELIDECK & LIVING QUARTER TO BE SUPPLIED BY UNION OIL

PANCAKE DECK "B"

PANCAKE DECK "A" BETWEEN (2) & (3)

T.O. SKID BEAM EL. (+) 76'-0"

DRILL DECK EL. (+) 75'-0"

PRODUCTION DECK EL. (+) 55'-0"

SUB DECK EL. (+) 30'-0"

EL. (+) 12'-0"

M.L.L.W. EL. 0'-0"

EL. (-) 29'-0"

LAUNCH ASSEMBLY @ LINE (2) & (3)

LAUNCH ASSEMBLIES NOT SHOWN

35-24"Ø CONDUCTORS 61-35"Ø CONDUCTORS TO BE SUPPLIED BY UNION OIL

EL. (-) 78'-0"

LAUNCH TRUSSES @ LINE (2) & (3) (TYP)

ANODE TO BE SUPPLIED BY UNION OIL AND INSTALLED BY FABRICATOR

EL. (-) 186'-0"

MUD LINE EL. (-) 205'-0"

48"Ø PILE

MUDMAT (TYP)

**EXHIBIT "E"**

FROM                                             MAY 1, 4, '90  9:57    NO.2060773517  PAGE 4

TO:         Mr. Michael Craig
            Unicol Corporation

FROM:       A. L. "Bob" Zielinski

SUBJECT:    Inspection trip 12 September 1989
            Quarters Platform Gilda


Reference facility fabricated by Delta Builders of Houston,
Texas.  Delta has been out of business for several years,
consequently no technical data is available.

Building is 40' X 40' two story made up from six stacked
modules.  Each module has a individual steel skid which set
on a 24' X 24' primary skid.

Construction is load bearing exterior walls with a
combination of load bearing interior walls and columns.
Wall, floor and roof panel is a combination of Bland-X board
interior a urethane core of varing depth Bland-X exterior
laminated to ¼" plywood and fiberglass exterior.

A general inspection was made by George Pinder and myself
including the primary skid, under deck, exterior and
interior walls, floor and roof.  With the exceptions notes
below this structure appears to be in very good condition.

1.  On the south elevation lower left corner the fiberglass
    and plywood have become delaminated from the Bland-X
    board.  Water has saturated the board and it is
    disintegrating.

    Recommend removing the fiberglass plywood and Bland-X
    from a 2' X 5' area and replacing with plywood then
    fiberglass over.

2.  Second floor hall at water fountain.  Apparently the
    original fountain leaked. Water penetrated the Bland-X
    subfloor and has totally failed.

    Recommend removing the floor covering, plywood and board
    in an area approximately 3' X 3', replace with 3/4"
    plywood and new floor.


                                    cc: J.A.Cron
                                        9.25.89


**EXHIBIT E - PAGE 1**

CHEV-AGU006416

FROM                                     1. 4. '90  9:57   NO.2060773517  PAGE  3

Mr. Michael Craig
Unicol Corporation
Reference:  Inspection of Quarters Platform Gilda
19 September 1989
Page 2 of 2


3.  Water has entered between a heavy build up of paint and
    the original fiberglass roof.

    Recommend  removing all paint and other foreign matter
    down to the original roof and applying a new fiberglass
    roof.

4.  There are several holes of varying size from normal
    traffic in the walls.  They should be patched over with
    fiberglass.

With reference to utilizing the roof as a helideck, we
submit the following for your consideration.

The roof, wall and floor panels are a composite section with
interaction between plywood/Bland-X board bonded together by
the urethane core.  Structural properties can be developed
for this section by a local engineering firm.  However
according to Mr. Bruce Cordorva former engineer with Delta,
the allowable stresses for Bland-X board of this vintage are
not available.  He also indicated load capacities for their
panels were determined by physical testing rather than
technical data.  Consequently it may be very difficult to
determine the allowable carrying capacity of this structure.

We suggest:

1.  Don't use the roof as a helideck.  Clean it, fiberglass
    over as previously suggested.

2.  If it is to be used on rare occasions, such as
    emergencies, clean off the existing paint, level it,
    screw down into the wood spaces at 4' on center.  3/4"
    treated plywood, preferably tongue and groove, to
    better distribute impact loads.  Fiberglass over the
    entire roof.


**EXHIBIT E - PAGE 2**

CHEV-AGU006417

FROM                                        1. 4.'98  9:58   NO.2060773517  PAGE 6

Mr. Michael Craig
Unicol Corporation
Reference:  Inspection Platform Gilda
19 September 1989
Page 3 of 3


3.  If regular helicopter service is required, we strongly
    suggest a separate structural system.  This could be
    carried by the primary skid beams 24' apart which
    project out one foot (1') on either side.

As previously noted, we feel this structure is in very good
condition.  Do a little maintenance now primarily to keep
water away from the Bland-X board and you will have years of
productive performance.


Sincerely,


R. X. "BOB" ZIELINSKI
INTERNATIONAL BUILDING SYSTEMS, INC.

CHEV-AGU006418

**EXHIBIT "F"**



EXHIBIT 5 – PAGE 001

**EXHIBIT "G"**

**Unocal Oil & Gas Divis**
Unocal Corporation
2151 Alessandro Drive, P.O. Box 6176
Ventura, California 93006
Telephone (805) 656-7600

# UNOCAL⑯

NOTED - CLIFTON

**Noted - Dunaway**

December 12, 1985

**Bill L. McFarland**
District Engineer
Southern California District



Mr. Thomas W. Dunaway
Regional Supervisor
Minerals Management Service
Pacific OCS Region
1340 West Sixth Street
Los Angeles, CA 90017

Santa Clara Unit, OCS P-0216

Dear Mr. Dunaway:

Attached are the three confidential copies you requested of an update to the Plan of Development for Santa Clara Unit, OCS P-0216, Platform Gilda, Santa Barbara Channel, California Offshore.

An additional confidential copy has been delivered to Mr. James W. Wright, District Supervisor, Ventura, California.

We consider these to be confidential documents. We expect that particularly the geological and reserve data will be held confidential by the M.M.S. Please let me know if we can be of further assistance.

Very truly yours,

BLM:dlp
Attachments

cc: Mr. James W. Wright

**EXHIBIT G - PAGE 001**

**EXHIBIT "H"**

**CONFIDENTIAL**

Santa Clara Unit
OCS P-0216
Platform Gilda

Update to Plan of Development
Unocal Corporation
October 3, 1985

Lease OCS P-0216 of the Santa Clara Unit is located nine miles west of Ventura, California in Federal Waters. Production is from four distinct reservoirs: the Pico, the Upper Repetto, the Middle and Lower Repetto, and the Monterey. Producing depths range from -2500'± SS to -8000'± SS. The Pico and Repetto reservoirs are composed of alternate sandstone and siltstone sequences and the Monterey formation is composed of fractured diagenetic rocks and shales. The trapping structure of the reservoirs is an east-west trending anticline with a major thrust fault located to the south of the field. Geologic contour and cross-section maps are shown in Figures 1 through 6. Large scale (1"=400', 1"=600') structure and cross-section maps of the reservoirs are attached in Figures 20 through 24. Production from the lease is handled by Platform Gilda which stands in 205' of water.

Cumulative production from Platform Gilda through August of 1985 is 6.21 MMSTB of oil and 13.34 BCF of gas. The current production rate (9/85) is 5200± BOPD, 2100 BWPD, and 10,500 MCF/D. Ultimate recovery of the currently developed portions of the field is estimated at 39.2 MMSTB and 60.1 BCF. A summary of each reservoir is shown in Table 1.

Initial production from the field began in 1981 from the Upper Repetto reservoir and in 1983 from the Pico reservoir. During 1984 and 1985 development of the Lower Repetto reservoir and Monterey Formation began. A total of 38 producers and 12 injectors are currently active in the field. Individual reservoir and field production curves are shown in Figures 7 through 11.

Future development of oil and gas reservoirs within the Santa Clara Unit will be continued at a reduced pace. Recently drilled wells in the Lower Repetto and Monterey zones have underscored geological uncertainties such as pay thickness, gas-oil and water-oil contacts, and contouring which have complicated development of the resource in each reservoir. By slowing the development pace, more time will be permitted for geological and reservoir evaluation between wells. Upon obtaining better geologic control, an increased development pace may resume.

During 1986, eight Lower Repetto wells and one Monterey well will be completed as shown in the 1986 drilling schedule in Figure 12. A second Monterey well will be in the drilling phase at the end of the year.

Potential undeveloped reserves within the field are estimated at 39.8 MMSTB of oil and 118.9 BCF of gas. It is estimated that an additional 46 wells (40 producers/6 injectors) will be needed to recover these reserves. Upon completion, all 96 conductor slots on the platform will have been used. The current and projected conductor slot allocation is shown in Table 2.

**EXHIBIT H - PAGE 1**

## Monterey Formation

**CONFIDENTIAL**

### Current Status

The Monterey Formation is the deepest of the four reservoirs in the field. The reservoir ranges in depth from −6000' to −8000' SS. The reservoir covers 1120 acres and has a volume of 669,000 ac-ft of which 253,000 ac-ft is a potential gas cap. OOIP is estimated at 113.9 MMSTB of oil and 110 BCF of gas. Cumulative production through August of 1985 is 99.2 MSTB and 234.1 MMCF. Initial production from the Monterey began in 1984 and currently two wells, S-49 and S-55, are producing. Ultimate recovery from these two wells is estimated at 1.2 MMSTB and 2.1 BCF of gas. The current production rate from the Monterey (8/85) is 600 BOPD, 700 BWPD, and 1900 MCF/D.

### Development Program

It is tentatively planned to develop the Monterey Formation with 23 wells on 40 acre spacing as shown on the Monterey's structure contour map in Figure 13. Initially, it is planned to drill eight wells on wider spacing with the remaining fifteen wells to be added as infill locations if further development is warranted.

Currently two producers, S-49 and S-55, are on line producing 100+ BOPD (2000 GOR) and a restricted 500+ BOPD (3500 GOR) respectively. Two additional wells, S-46 and S-59, are presently being drilled into the offsetting eastern and western blocks of the Monterey trend and will be completed by November of 1985. During 1986 two more Monterey wells will be drilled into these same off-setting fault blocks.

The 1986 drilling will commence on one well in June and the other in December. The June spud date coincides with the installation of a new 20 MMCF/D gas sweetening system scheduled for completion in June of 1986. The current 6 MMCF/D gas sweetening system is projected to be at full capacity by the end of 1985 and therefore would not be able to handle any additional gas from the two 1986 development wells.

### Recovery

Potential recovery from the Monterey could be as high as 19 MMSTB of oil and 77 BCF of gas. Future delineation drilling will provide a better estimate of the ultimate oil and gas recovery. Forecasting the production response from an undeveloped Monterey field has historically proven to be misleading and its accuracy questionable. Due to the Monterey's complex nature, it is presumptuous to assume that all the Monterey wells will perform similar to current producers S-49 or S-55. Only after a representative number of producers have been on line for a few years can an accurate forecast be made. The key is to drill representative wells which will define (1) the reservoir limits and (2) the productive capabilities of the field. This will hopefully be accomplished with the current eight well development underway.

**EXHIBIT H - PAGE 2**



CONFIDENTIAL

## Monterey Production Facilites

### Monterey Oil and Gas Separation System

The permanent oil—gas separation system is shown on the attached
Figure 15.  The test separator and gross separator, and the associated
piping downstream of the separators for liquid flow are all existing
equipment.  New equipment recently installed includes four headers (2 in
each wellroom) that can handle both Repetto and Monterey production.  All
Monterey production from wellrooms 2 and 4 is routed to wellroom 4 via
the four new lines installed across the platform.  These are (1) test
oil, (2) test gas–casing, (3) gathering gas–casing, and (4) gross oil.
New piping was installed downstream of the separators for the gas from
the Monterey wells.  These lines tie into the casing gas lines and are
routed to our temporary sweeteners.

### Temporary H$_2$S Sweetening System

The temporary sweetening system was installed in July of 1985 and is
shown on Figure 16.  The 7' diameter vessel can handle 6 MMSCFD and the
8' diameter vessel can treat 8 MMSCFD of sour gas with an outlet less
than 4 ppm H$_2$S.  The gas is metered and then split so the vessels can
be operated in parallel if desired.  Each individual gas stream is
metered again and then a 200 gpm rate of scrubbing solution is added to
each gas stream as it goes through a static mixer.  The gas then gets a
final scrubbing in the vessels and exits to the compressor suction.  If
sour gas (4 ppm H$_2$S) is detected in the sales gas line the Monterey gas
goes to flare.  If the flare rate approaches 500 MCFD then the well is
shut-in.  These vessels and skids will be located in front of the control
room (see Figure 17).  The current plan is to add a third 8' vessel in
November.

### Permanent H$_2$S Sweetening System and Process

An amine gas treating unit has been selected to sweeten the Monterey
formation sour gas on Platform Gilda.  This is a proven process,
considered to be the industry standard, and will consistently yield sales
gas containing less than 4 ppm hydrogen sulfide.  The amine unit is a
regenerative process that produces a highly concentrated sour tailgas,
which requires additional processing to remove the hydrogen sulfide.  A
simplified flow schematic of the process is shown on Figure #18.

A Selectox sulfur recovery unit will be installed to remove the sulfur
components in the tailgas from the amine regeneration column.  This
system is a Union Oil patented process that uses a three stage catalytic
reactor to convert the hydrogen sulfide directly into a saleable pure
grade molten sulfur product.  Figure #19 shows a simplified flow
schematic of the process.  The Selectox unit uses no toxic catalysts,
produces no hazardous waste products, and is considered by the Federal
E.P.A. to be the B.A.C.T. for sulfur recovery of less than five tons per
day.

**EXHIBIT H - PAGE 3**

CONFIDENTIAL

Employing a compact modular design, the amine gas treating and Selectox sulfur recovery units will be located on the production deck, as shown on Figure #17.  Relocation of the existing glycol regeneration skid and light water tank will provide the deck space necessary for the new units.  A cantilevered deck section will be added to the production deck to accommodate the amine unit process columns.

Load Capacity

The original platform production deck was designed for loading of 500 lbs/ft.$^2$  Both the large (7' and 8' vessels) temporary process and the permanent process will be skid mounted to distribute the load to a smaller degree than 500 lbs/ft.$^2$

 **CONFIDENTIAL**

## Pico and Repetto Reservoirs

### Pico Gas Reservoirs

The Pico gas sands are divided into Upper, Middle, and Lower Pico
reservoirs. Upper Pico sands range in depth from -1654' SS to -2400' SS.
None of the Upper sands has yet been tapped for production because of gas
sales limits placed on Union by the Southern California Gas Company.
Eventually, these sands will be developed in a recompleted well to
deplete the reserves estimated at 5 BCF.

The Middle Pico sands range in depth from -2860' SS to -3435' SS. Most
of these sands are being depleted by well No. S-16, which was completed
in July, 1983. Since then, the well has produced 4.2 BCF of gas.
Ultimate recovery, when last evaluated, was predicted to be 8.0 BCF.
However, recent water production in the well may signify that the
ultimate recovery will be less. Well No. S-16 is currently producing
2.3 MMCF/D.

Ranging in depth from -4659' SS to -4980' SS are the Lower Pico gas sands.
Until just recently, it was believed that these sands were only gas
saturated on the eastern anticline of the field. However, gas saturated
sands were encountered on the western anticline in September, 1985 by
proposed Monterey well No. S-59. Evaluation of the potential resource on
the western anticline has not been completed. Either a new well, perhaps
a dual string producer combined with the Upper Pico, or a recompletion
may be planned to deplete potential reserves. The Lower Pico sands on
the eastern anticline are currently being drained in recompleted well
No. S-11. This well appears to have been damaged when recompleted in
March, 1984. Since that time, the well has only produced 157 MMCF of the
potential 1 BCF.

### Upper Repetto Reservoir

Development of the Upper Repetto reservoir from -4800' SS to -6076' SS was
begun in October 1981. This reservoir was the main objective for which
Platform Gilda was set. First oil production came in December, 1981 with
the completion of well No. S-1. Following that, drilling was continued
with one, and later two, rigs until 28 producing and 12 injection wells
were completed on nominal 20-acre spacings.

As of September 1, 1985, recovery from this reservoir was 5,926,779
barrels of oil and 8.5 BCF of gas. Current production is about 4200
BOPD, 1500 BWPD, and 5600 MCF/D. Between 12,000 and 15,000 BWPD of
treated seawater is being injected.

During the development drilling, which was temporarily stopped in June,
1985, several characteristics of the reservoir forced alterations on the
original development plan. For example:

**EXHIBIT H - PAGE 5**

CONFIDENTIAL

1)    A primary gas cap was discovered on the eastern anticline
with well No. S-10 and then confirmed with well No. S-11,
leading to the elimination of a few crestal well locations.

2)    Pressure depletion occurred much more rapidly than predicted
by the original reservoir model study, leading to the initiation
of a peripheral injection program for pressure maintenance.

3)    Sands thinned more rapidly to the south than anticipated
making several southern well locations non-commercial.

To fully evaluate the potential for this heterogeneous reservoir, a
second model study has recently been initiated.  This model should be
useful for predicting future performance and ultimate recovery under
current operating practices.  Also, this model will be used to evaluate
benefits of gas injection, pattern waterflooding, further drilling, and
enhanced oil recovery.


Middle Repetto Reservoir

Two wells (S-36, S-51) have been drilled into the Middle Repetto group of
sands between -6173' SS and -6820' SS north of Platform Gilda.  Neither
well produced at commercial rates because of the low permeability of the
sands.  Well No. S-51 has recently been recompleted as an Upper Repetto
injector.  Well No. S-36 is currently producing 34 BOPD.  A fracture
treatment of S-36 may be attempted to unlock potential reserves in the
sands. If the frac job is successful, further development of the sands
would continue.  However, if the treatment is unsuccessful, development
of the reserves will be postponed until Upper and Lower Repetto wells
become uneconomic and can be redrilled to drain the Middle Repetto sands.

Cumulative production from the Middle Repetto LP-F through LP-J sands is
24,111 barrels of oil and 31 MMCF of gas as of September 1, 1985.
Production from these sands was begun in December, 1984.


Lower Repetto Reservoir

Four wells on OCS P-0216 have been drilled from Platform Gilda into this
group of sands from -6480' SS to -8962' SS.  Also, at least two wells on
each adjacent tract 0215 and 0217 have been tested to suggest that the
LP-K through LP-N (and possible LP-O to LP-S further north) could contain
a significant  amount of reserves in the range of 20 to 30 million
barrels.  Further delineation of the individual sand thicknesses, gas-oil
contacts, and water-oil contacts is necessary to accurately appraise the
potential.

The first of the four wells drilled into these sands from Platform Gilda
was well No. S-26.  It was completed in April, 1984.  The second well
(S-40) was completed in March, 1985 and recompleted in May, 1985 after
producing high rates of gas, oil, and sand.  The most recent completions
are wells No. S-44 and S-57.  These wells were completed in August, 1985.

CONFiDENTIAL

As of September 1, 1985, the Lower Repetto group of sands had produced 156,852 barrels of oil and 229 MMCF of gas. Current production from these four wells is about 850 BOPD and 450 MCF/D.

Current development plans are to continue an 80 acre step-out drilling to delineate the reservoir sands as shown in Figure 14. Tentatively, the reservoir will be developed on 40 acre staggered well spacings. Then every other center row well will be converted to water injection to yield a five-spot flood in the LP-L and LP-M sands, and a peripheral flood in the LP-K and LP-N sands. Based on further reservoir delineation, up to 24 wells could be required to fully develop the potential of the Lower Repetto sands.

1153r

**EXHIBIT H - PAGE 7**

**EXHIBIT "I"**

150                                                          July 29, 1986


Unocal Corporation
Unocal Oil & Gas Division
Attention:  Bill L. McFarland
P. O. Box 6176
Ventura, CA   93006

                              Re:  Santa Clara Unit, OCS-P 0216, Update
                                   to Development and Production Plan

Gentlemen:

On December 12, 1985 Union submitted an update to the Development and Produc-
tion Plan (DPP) for Platform Gilda.  This update includes discussion of
Monterey Formation development beyond that included in the initial DPP, as
well as additional information on development of the Pico and Repetto.  We
have considered several aspects of this update, as discussed below.

Verification of Platform Changes.  Union's proposal for a permanent $H_2S$ sweet-
ening system includes the addition of a cantilevered deck section to the pro-
duction deck.  In our letter of March 18, 1986, we approved the selection of
PMB Systems Engineering, Inc. as Certified Verification Agents for design,
fabrication, and installation of the deck modifications.  This verification
process requires the submittal of design, fabrication, and installation plans
and reports for review and approval by the MMS.

Reservoir Development.  We have evaluated the development scenario presented
in the DPP update and we believe it to demonstrate prudent and diligent devel-
opment.  Both the original DPP and the update note Union's intention to eval-
uate benefits of gas injection.  We request that this evaluation be continued,
and that the secondary benefit of re-injection, the reduction of upset flar-
ing, be considered.

Air Quality.  On June 18, 1986 we received in this office air emissions data
for the permanent $H_2S$ removal facility.  These data show an estimated 61.7
tons per year of $SO_2$ emissions based on throughput of 20 MMSCFD.  Based upon
existing distance-based formulas specified in regulations governing air emis-
sions (30 CFR 250.57), the estimated emissions from this proposal are accept-
able.

Based upon the analyses discussed above, the Platform Gilda DPP update is
hereby approved.  This approval is contingent upon acceptable completion of
the following:

**EXHIBIT I - PAGE 1**

2

1.  Submittal of design, fabrication, and installation plans and reports for the cantilevered deck section.

2.  Continued submittal of annual plan of operations, including consideration of gas re-injection.

3.  Continued submittal and analysis of quarterly emission inventory reports and monthly flaring reports. If these reports show either emission or flaring volumes to be excessive, MMS will take necessary action to resolve the problem.

If there are any questions regarding this letter, please call Ms. Susan Lee at (213) 894-6719.

Sincerely,

**(Orig. Sgd.) James R. Mason, Jr.**

Thomas W. Dunaway
Regional Supervisor
Office of Field Operations

bcc:  FILE: Santa Clara Unit, OCS-P 0216 (Platform Gilda) DPP Corres.
      Chron
      RD
      C/OR&A
      SLee
      C Sarwar
      E Lee
      DS/V

OFO:SYLee:mu Disk 6 Doc. 27

| Adams | MMUA 7-29-86 |
| Ahlgren | |
| Dunaway | Pc 7-29-86 |
| Lee, E. | |
| Lee, S | Slee 7/29 |
| Mason | |
| Sarwar | |
| Shackell | |
| Tuder | |
| Van Auker | |
| Jones | ✓D |
| RS, OL&E | |
| RS, ORE | |
| | |

**EXHIBIT I - PAGE 2**

**EXHIBIT "J"**



# United States Department of the Interior

### MINERALS MANAGEMENT SERVICE
#### PACIFIC OCS REGION, VENTURA DISTRICT
145 NORTH BRENT STREET SUITE 202
VENTURA, CALIFORNIA 93003

**Noted - Dunaway**

In Reply Refer To :
MMS—Mail Stop

March 25, 1986

Memorandum

To:        Regional Supervisor, Office of Field Operation, Pacific OCS Region

From:      District Supervisor, Ventura District

Subject:   Santa Clara Unit OCS-P 0216 Platform Gilda, Plan of Development

The Ventura District Office has reviewed the subject Plan of Development submitted by Uniocal on December 12, 1985.

We have no comments to offer on the Plan of Development as presented. It was also noted that there were no significant departures to the Plan of Development presented during the annual review of operations for Platform Gilda held in the Minerals Management Service Los Angeles office on March 18, 1986.

James W. Wright

bcc:  Union OCS-P 0216 General Correspondence
      Union OCS-P 0216 Plan of Development
      Platform Gilda File
      R.O. Courtright
      J. W. Wright
      Chron
ROCourtright/jh

MINERALS
PAC...

MAR 26 1986

FIELD OPER...
LOS ANGEL...

**EXHIBIT J - PAGE 1**